## EVANDRO S. SANTINI ET AL. *v.* CONNECTICUT HAZARDOUS WASTE MANAGEMENT SERVICE (SC 16023)

Callahan, C. J., and Borden, Berdon, Norcott, Katz, Palmer and McDonald, Js.*

---

\* The listing of justices reflects their seniority status on this court as of the date of argument.

Argued May 25—officially released November 9, 1999

*Timothy S. Hollister*, with whom was *Joseph P. Williams*, for the appellants (plaintiffs).

*Frank H. Santoro*, for the appellee (defendant).

*William H. Ethier* filed a brief for the Home Builders Association of Connecticut, Inc., et al. as amici curiae.

*Richard Blumenthal*, attorney general, and *Robert D. Snook*, assistant attorney general, filed a brief for the state department of economic and community development et al. as amici curiae.

*Opinion*

BORDEN, J. The dispositive issue in this appeal[1] is whether mere governmental planning may constitute a taking, in the form of an inverse condemnation, under article first, § 11, of the Connecticut constitution.[2] The

---

[1] The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

[2] Article first, § 11, of the Connecticut constitution provides: "The property of no person shall be taken for public use, without just compensation therefor."

plaintiffs, Evandro S. Santini (Santini) and Santini Homes, Inc. (Santini Homes), appeal from the judgment of the trial court rendered in favor of the defendant, the Connecticut Hazardous Waste Management Service. By that judgment, the trial court concluded that no unconstitutional taking of any kind had occurred.

The plaintiffs claim that the trial court improperly concluded that: (1) the designation of the plaintiffs' properties among the three finalists for acquisition and development as a disposal facility for low-level radioactive waste was not a practical confiscation and, therefore, was not an inverse condemnation under article first, § 11, of the state constitution; (2) the defendant's conduct did not amount to an inverse condemnation under the alternative balancing test; and (3) mere governmental planning does not constitute a taking, in the constitutional sense. We conclude that mere governmental planning does not, as a matter of law, constitute a taking under article first, § 11, of the state constitution, and that the defendant's conduct constituted only such planning. We therefore affirm the judgment of the trial court.

Some initial background is necessary to an understanding of this case. In the late 1970s, disposal capacity for low-level radioactive waste became a national issue. See *New York* v. *United States*, 505 U.S. 144, 150, 112 S. Ct. 2408, 120 L. Ed. 2d 120 (1992). In 1979, disposal facilities for low-level radioactive waste were available only in Nevada, South Carolina and Washington. Id. A temporary shut down of the facilities in Nevada and Washington left South Carolina with the burden of accepting all of the low-level radioactive waste produced nationally. In response, South Carolina reduced the amount of waste that it would accept by 50 percent. Id. In addition, "Washington and Nevada announced plans to shut down their sites permanently." Id. Faced with the threats of closings of the disposal facilities in

these states, Congress enacted the Low-level Radioactive Waste Policy Act of 1980. Pub. L. No. 96-573, 94 Stat. 3347 (1980), codified at 42 U.S.C. § 2021b et seq. "The 1980 Act authorized States to enter into regional compacts that, once ratified by Congress, would have the authority beginning in 1986 to restrict the use of their disposal facilities to waste generated within member States." *New York* v. *United States*, supra, 151.

In 1985, there were only three approved regional compacts giving rise to operational facilities. Id. This meant that, by 1986, as many as thirty-one states had no "assured outlet for their low-level radioactive waste. With this prospect looming, Congress once again took up the issue of waste disposal." Id. The result was the Low-level Radioactive Waste Policy Amendments Act of 1985; Pub. L. No. 99-240, 99 Stat. 1842 (1985), codified at 42 U.S.C. § 2021c (a) (1) (A); which required states to accommodate the low-level radioactive waste generated in their states by disposing of it either in-state or through compacts with other states by the end of 1992.[3]

To encourage the implementation of the amendments, the 1985 act provided for three kinds of incentives. *New York* v. *United States*, supra, 505 U.S. 152–54. Among the incentives was the so-called "take title" provision, which required that a state that had not provided for an appropriate disposal facility by January 1, 1996, to take title and possession of the waste generated in such state or compact region or become liable to the generator for failing to do so. Id., 153–54. In *New York*

---

[3] The amendments of the 1985 act represented a compromise between the three states that had the appropriate disposal facilities capable of handling low-level radioactive waste, the so-called sited states, and those states that did not have such facilities. *New York* v. *United States*, supra, 505 U.S. 151. In a nutshell, the sited states agreed to continue to accept the waste "from the beginning of 1986 through the end of 1992"; id., 152; and the states without the facilities agreed "to end their reliance on the sited States by 1992." Id., 151.

v. *United States*, supra, 177, the United States Supreme
Court held that the take title provision of the amend-
ments of the 1985 act was unconstitutional. The other
provisions that were being challenged, however, sur-
vived. Id., 173–74.

In 1987, the Connecticut General Assembly adopted
legislation for the development of a low-level radioac-
tive waste disposal facility and charged the defendant[4]
with the responsibility of locating a suitable site in
Connecticut. General Statutes § 22a-163c.[5] The defen-
dant developed a plan pursuant to § 22a-163c to locate
a proper disposal site in Connecticut for a facility for the

---

[4] The defendant is "a public instrumentality and political subdivision of
the state of Connecticut"; General Statutes § 22a-134bb (a); that, "in addition
to its responsibilities under chapter 445a, [has the statutory obligation to]
assist the state in fulfilling its responsibilities under the Northeast Interstate
Low-Level Radioactive Waste Compact to provide for the management of
low-level radioactive waste pursuant to the provisions of said compact.
. . ." General Statutes § 22a-163b.

[5] General Statutes § 22a-163c provides: "Upon completion of the manage-
ment plan required under section 22a-163b, the service shall evaluate and
select one or more potential sites for a regional low-level radioactive waste
facility. In making its evaluation, the service shall consider, but not be
limited to, the following factors: (1) The economic feasibility of a waste
facility at the site, including the proximity of the site to concentrations of
generators of low-level radioactive waste; (2) the potential compliance of
any waste facility constructed at the site with federal and state laws and
regulations, including, but not limited to, environmental laws and regula-
tions; (3) the risk a waste facility at the site would pose to the local public
health, safety and welfare, including the risk from an accidental release of
low-level radioactive wastes during transportation to the facility or while
at the facility, and the risks from water, air and land pollution and from
fire and explosions; (4) the effect of any waste facility constructed at the
site on existing and planned local land use and development, and on local
public facilities and services and private institutions; (5) the adverse effects
of a waste facility at the site on agricultural and natural resources and the
availability of resources for mitigating or eliminating such adverse effects
by stipulations, conditions and requirements for the facility's design and
operation; (6) the potential effects of any such facility on private and public
water supplies; (7) the current and projected population density in the area
where the facility is to be located; and (8) any other factor the service
deems appropriate."

disposal of low-level radioactive waste. The defendant then retained the Battelle Memorial Institute as the siting contractor to implement the site selection plan. Although the plan was not completed, in that no site actually was selected to become the location of the disposal facility, the defendant selected three candidates, any one of which potentially could have become the so-called "preferred site."[6]

After being selected as the preferred site, several additional administrative requirements would have been required for the site to become operative, namely, permits from the federal Nuclear Regulatory Commission, the state department of environmental protection; General Statutes § 22a-163h (d);[7] and the Connecticut siting council; General Statutes § 22a-163h (a); would have been required.[8] Additionally, a proposed facility

[6] The selection plan was to be carried out in several steps. The initial step was to screen the entire state for sites that were likely to be suitable. The next step involved identifying those sites that actually could have been suitable. Then the number of possible sites were to be narrowed to eight choices, a list of which was to be submitted to the defendant's board of directors. Out of the eight choices, three candidates were to be selected by that board. The last step, which was never implemented, was to perform on-site examinations of the candidate sites. From the three designated sites, one would have been chosen as the preferred site. The preferred site would have been studied further in accordance with the federal Nuclear Regulatory Commission's requirement of continuous monitoring for at least twelve months.

[7] General Statutes § 22a-163h (d) provides: "The council shall not accept any application for a certificate for a low-level radioactive waste facility until the applicant has applied to the Commissioner of Environmental Protection for all licenses, permits or approvals which are within his jurisdiction. The commissioner shall make available to the council the record of proceedings on the application for environmental licenses, permits or approvals. The commissioner shall immediately notify the chief elected official of the town where the facility is proposed to be located of receipt of an application for such licenses, permits or approvals."

[8] General Statutes § 22a-163h (a) provides: "An application for a certificate shall be filed with the council, accompanied by a fee established by regulation adopted by the permanent members of the council, as provided in section 22a-163f, containing such information as the council may deem relevant, including, but not limited to, the following: (1) A description, including estimated cost, of the proposed facility; and a description of the waste to

be handled and management technology to be used and, if a land disposal facility is proposed, an explanation of why no other management method is reasonably available; (2) reasons for choosing the site and the proposed type of low-level radioactive waste facility selected and a comparison of alternative sites and technologies; (3) a schedule of dates setting forth the proposed program of acquisition, construction, completion and operation; (4) environmental site information including, but not limited to, (A) maps with narrative description of air quality and movement, ground and surface water conditions, levels, movement and fluctuations, vegetation and wildlife populations and habitat, seismic characteristics and hydrogeologic evaluation of the site, setting forth data and analysis as the council shall require, including but not limited to, a map showing the proximity of the proposed site to facilities or properties owned or operated by a water company as defined in section 25-32a, a map showing the land classification of the proposed site under the classification established by section 25-37c, and a report on the impact of the proposed facility on the environment including, but not limited to, present and future public water supplies and private wells and (B) design, capacity, operation and management information; (5) human population density information for the area of the proposed facility; (6) traffic information including road and transportation access data and maps; (7) information on present and future development of the town where the facility is proposed to be located and for the surrounding towns; (8) a detailed description of provisions, including equipment and operation, for planning for prevention of hazards, monitoring of ground water quality, mitigation of the effect of the operation of the facility on public health, safety and welfare and the environment, and contingency plans and emergency procedures for dealing with facility malfunctions; (9) a listing of federal, state, regional and municipal agencies from which approvals have been received and the planned schedule of obtaining those approvals not yet received; (10) incentives offered and benefits accruing to the municipality in which the proposed facility is to be located; (11) an assessment of the need for the facility and the amount and types of the state's annual low-level radioactive waste generation which the applicant proposes to dispose of, treat or store at the facility; (12) a plan for facility closure and stabilization and postclosure observation and maintenance and transfer of the facility to the custodial agency for institutional control, as required by regulations adopted by the commissioner pursuant to section 22a-163f; (13) a detailed statement of the applicant's financial capabilities as well as a statement of the applicant's qualifications and previous experience with low-level radioactive waste management, including, but not limited to, a listing of all low-level radioactive waste management projects or methods with which the applicant has had any connection or affiliation, either as owner, operator, contractor, supplier or consultant and if the person is a business entity, the names and addresses of all parent and subsidiary corporations, partners, corporate officers and stockholders holding more than fifteen per cent of the stock of the corporation; (14) a list of any criminal or civil charges and enforcement actions, or other formal or informal enforcement proceedings

might have been subject to regulations and restrictions imposed by "any town, city or borough," which would have been subject to review by the siting council. General Statutes § 22a-163n (b).[9] If these requirements had

related to low-level radioactive waste or to other state or federal laws, regulations, licenses, permits, approvals, certificates or orders in which the applicant or any corporate parent, subsidiary, affiliate, partner, corporate officer or director or stockholder holding more than fifteen per cent of the stock of the corporation has been involved; (15) a schedule of dates for the initial receipt of wastes at the facility and facility closure; (16) an analysis of the compatibility of the facility with surrounding land uses; (17) local, state, and federal standards, codes, and regulations applicable to the design, location, operation, and closure of the facility; (18) a description of the proposed methods of segregation and storage of wastes, any treatment processes to be used, and methods of waste emplacement; (19) a description of all proposed facility pollution monitoring and proposed control methods and procedures; (20) a description of proposed audit and quality control procedures; (21) a health risk assessment, including projected effects on mortality and morbidity rates among affected populations; (22) a description of methods of preventing inadvertent intrusion and assuring facility security; (23) applicable design criteria pertaining to natural phenomena and a description of how the proposed design of the facility meets these criteria; (24) an analysis of the amounts of third party insurance, surety bonds, trust funds and other forms of security that will be required to meet the financial requirements specified in subsection (d) of section 22a-163*l* and in section 22a-163o; (25) a plan for meeting the financial requirements analyzed under subdivision (24) of this subsection; (26) a description of the management and administrative program for the operation of the proposed facility which contains the name of the principal individual to be responsible for operation, a resume of the individual's qualifications and experience, and a statement of the number, duties, qualifications and experience of all key personnel, as determined by the council, to be involved in the storage, treatment or disposal of low-level radioactive waste; and (27) a copy of any application and any environmental report the applicant files with the United States Nuclear Regulatory Commission to obtain a license to operate a regional low-level radioactive waste management facility if a license is required."

[9] General Statutes § 22a-163n (b) provides: "A proposed low-level radioactive waste facility may be regulated and restricted by any town, city or borough pursuant to chapters 124 and 126 and by any municipality pursuant to sections 22a-42 and 22a-42a. The applicant shall apply for any permits required by such agencies at the same time as the filing of the application with the council. Such local bodies may make all decisions necessary to the exercise of such power to regulate and restrict, which decisions shall be made within one hundred thirty days of any application notwithstanding any other statute to the contrary and shall be in writing and recorded in

been satisfied, eminent domain proceedings would have gone forward and the property owner would have been compensated. General Statutes § 22a-163w (c).[10] The department of public works, rather than the defendant, would have been the entity responsible for acquiring the site. General Statutes § 22a-163w (b)[11] and (c).

On June 10, 1991, the defendant announced the location of the three sites, one of which overlapped certain properties in Ellington that were owned by the plaintiffs.[12] In January, 1992, the governor's office proposed legislation to rescind the statutory acquisition of a public facility for the disposal of low-level radioactive waste in Connecticut. On May 5, 1992, the legislature repealed the siting announcement.[13] See Public Acts 1992, No. 92-45.

the records of their respective communities, and written notice of any decision shall be given to each party affected thereby. Each such decision shall be subject to the right of appeal within thirty days after the giving of such notice by any party aggrieved to the council, which shall have exclusive jurisdiction, in the course of any proceeding on an application for a certificate or otherwise, to affirm, modify or revoke such order or to make any decision in substitution thereof by a vote of eight of the members of the council. Appeal of a local zoning decision to the council shall be in lieu of any other appeal authorized by the general statutes."

[10] General Statutes § 22a-163w (c) provides: "The Commissioner of Public Works shall have the power to condemn real property, in accordance with the procedures set forth in sections 8-129 to 8-133, inclusive, for the purpose of siting a regional low-level radioactive waste facility, provided such property is selected by the service as the site for a low-level radioactive waste facility."

[11] General Statutes § 22a-163w (b) provides: "The Commissioner of Public Works shall initiate actions to acquire, through purchase or otherwise, the site selected by the Connecticut Hazardous Waste Management Service as the site for a low-level radioactive waste facility as specified in subsection (b) of section 22a-163d. The Commissioner of Public Works shall initiate such actions when notified by the service that the site has been selected. Acquisition of the site shall not be subject to review by the State Properties Review Board."

[12] Two of the sites were located in the town of Ellington. The third site was located on the border of the towns of East Windsor and South Windsor.

[13] The record before us indicates that, to date, no disposal facility has been built in Connecticut. The low-level radioactive waste generated in Connecticut is being shipped to Barnwell, South Carolina, for disposal.

Thereafter, the plaintiffs brought this action against the defendant claiming that its action in designating certain property of the plaintiffs in Ellington as a potential site for a low-level radioactive waste disposal facility constituted a temporary taking by inverse condemnation without just compensation[14] in violation of article first, § 11, of the Connecticut constitution. The plaintiffs alleged that their property was the subject of a taking from June 10, 1991, through 1994, which included the eleven months that the siting announcement was in place and a "stigma period"[15] that followed the May, 1992 legislative abrogation of the selection of the three candidate sites. The plaintiffs alleged that the siting announcement: (1) prevented them from selling homes and lots in certain property known as the Ellridge Estates subdivision; (2) prevented them from proceeding with further construction of Ellridge Estates or development of certain property abutting Ellridge Estates; and (3) denied them any economic return on the investments they had made in those properties. These impacts, the plaintiffs alleged, resulted in the destruction of the fair market value, and the deprivation of all economically viable use, of their properties, thereby constituting a practical confiscation. The plaintiffs also alleged that the defendant's announcement undermined their reasonable "investment-backed expectations of completing the development of their

[14] "Inverse condemnation should be distinguished from eminent domain. Eminent domain refers to a legal proceeding in which a government asserts its authority to condemn property. . . . Inverse condemnation is a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted. . . . *Agins* v. *Tiburon*, 447 U.S. 255, 258 n.2, 100 S. Ct. 2138, 65 L. Ed. 2d 106 (1980)." (Citations omitted; internal quotation marks omitted.) *Bauer* v. *Waste Management of Connecticut, Inc.*, 234 Conn. 221, 249–50 n.15, 662 A.2d 1179 (1995).

[15] The plaintiffs alleged that the negative impact of the defendant's announcement continued through 1994, after the siting announcement officially was lifted in 1992. They refer to this period as the "stigma period."

properties . . . ." After a trial to the court, the trial court concluded that there had been no unconstitutional taking and, accordingly, rendered judgment for the defendant.

The trial court found the following facts. Santini is a developer of single-family houses and rental apartments. He is the president and the treasurer of Santini Homes, a Connecticut corporation engaged in the construction business. Santini Homes is a subchapter S corporation, which allows income derived or losses claimed from it to pass through to Santini.

In 1985, Santini purchased a twenty acre subdivision in Ellington known as Ellridge Estates. Ellridge Estates was then, and at the time of the trial remained, zoned for single-family residential homes. It was then eligible for sewer service from the town of Ellington, had an available water supply, and had no wetlands or other environmental obstacles that could restrict its development for residential purposes.

In the same year, the Ellington planning and zoning commission approved a subdivision plan for a sixteen lot subdivision on Ellridge Estates. Santini then began to build the infrastructure for Ellridge Estates, which included "the water supply connections, drainage improvements, and the access road." In the same year, the Ellington water pollution authority requested Santini to install a sewage disposal pipe beneath the access road in Ellridge Estates "to be connected to the public sewer system." He installed the sewer line.

In 1986, Santini transferred Ellridge Estates, which he had bought for $147,500, to Santini Homes for $864,000. In 1987, the real estate market started to decline.

In 1988, Santini purchased a fifty-four acre parcel of land adjoining Ellridge Estates, which has several

hundred feet of frontage on Pinney Street, a town road (Pinney Street property). Ten acres of the Pinney Street property was, and at the time of the trial continued to be, zoned for multifamily residential use. This part of the property is within 600 feet of Pinney Street. The remaining portion of the Pinney Street property was zoned for single-family homes in the same way as Ellridge Estates. Similar to Ellridge Estates, the Pinney Street property had access to the town's sewer service, had an available water supply, and its use was not restrained by environmental restrictions. Upon its purchase, Santini discontinued the agricultural use of the Pinney Street property.

Having acquired the Pinney Street property, the plaintiffs had acquired the land necessary to proceed with their development plan. The plan was to build luxury homes on the sixteen subdivided lots on Ellridge Estates, and smaller, less expensive single-family houses on the Pinney Street property. The plaintiffs also had considered building multifamily homes on the ten acres of the Pinney Street property that was closest to Pinney Street.

In 1987, Santini Homes began to build two model homes on the sixteen subdivided lots in Ellridge Estates, and two more model homes in 1989. The infrastructure of the subdivision continued to be developed from late 1989 through the spring of 1991. In late 1990, and early 1991, using his income from a rental complex in Vernon, Santini borrowed more than $20 million, at an average interest rate of 9 percent, from Prudential Insurance Company, Manufacturers Life and the New Connecticut Bank and Trust/FDIC, in order to provide financial support to Santini Homes. In March, 1991, the construction creditor for Ellridge Estates, Society for Savings, instituted a favorable mortgage loan program for residential purchasers. The availability of credit, the

trial court inferred, exhibited the "beginning of the end of what had been called the 'credit crunch' of 1989–90."

In March, 1991, all but ten acres of Ellridge Estates was removed from the Ellington sewer district. The removal reduced the value of the Pinney Street property. Although the sewer line that the plaintiffs had constructed at the town's request was rendered useless, the value of Ellridge Estates was not affected substantially because septic systems had been approved for that property.

On June 10, 1991, the defendant announced that a 250 acre area in Ellington, along with two other sites, had been designated as candidates for the construction of a low-level radioactive nuclear waste disposal facility. The defendant also identified five other "back up sites" about two weeks after its June, 1991 announcement. The 250 acre area in Ellington that the defendant had designated as a candidate site included the Pinney Street property, twelve of the completed subdivided lots in Ellridge Estates, and part of the access road to the twelve lots. The area did not include the four homes that already had been built. It is important to emphasize that neither Ellridge Estates nor the Pinney Street property definitely was subject to being taken by the state because the Ellington area had not as yet been designated as the preferred site for a low-level radioactive waste facility.

The plaintiffs had not been aware of the site selection process prior to the June 10, 1991 announcement. Furthermore, the trial court found that the defendant had not filed any notice or lien on the Ellington land records with respect to the siting announcement. The trial court also determined that "the site designation process was secret."[16]

---

[16] The process that led to the selection of the three candidate sites was not public, although the three candidate sites were selected by the defendant's board publicly from data that had been presented to the board in a geographically neutral manner. The defendant's board had made the decision

The announcement caused some negative effects on the real property sales near the three candidate sites. Santini Homes experienced difficulty in selling the homes that were being constructed on the four subdivided lots outside of, but in proximity to, the designated area.[17] Minor incentives were offered to promote sales. Development could not proceed so that debts could be paid down from the proceeds, however, because "additional construction might not have been compensable in eminent domain proceedings if the sites were eventually taken." In May, 1992, the legislature rescinded the siting announcement of the Ellington area as a disposal site.

In August, 1992, the plaintiffs sold a home to Jeffrey Zoufaly and his wife for $530,000. In December, 1991, having taken the defendant's announcement into consideration, that home had been appraised at $400,000. In June, 1997, Santini Homes bought that house back from Zoufaly "for $460,000 or $470,000." There also had been negotiations for the sale of a house to another buyer, James Wysocki, who had offered to pay a purchase price in the mid-$300,000 range, with a $50,000 deposit. Santini Homes rejected this offer. Initially, the homes had been offered in the $500,000 range. By 1991, the asking price for the homes that had not been sold had been reduced by $50,000.

The trial court concluded that there had not been a practical confiscation, temporary or permanent, of

not to disclose the intermediate steps leading to the selection of the candidate sites in order to minimize the possibility of creating unrest in communities. It is undisputed, however, that in early 1991, the defendant had held a series of public meetings to inform various decision makers in the state, including local elected officials, of the selection plan. In addition, several briefings were held for various legislative committees while the legislature was in session, and a special briefing was conducted in May, 1991, to apprise the legislature of the defendant's progress and how the defendant planned to proceed.

[17] No homes were sold prior to the defendant's announcement.

either property because the defendant's selection of the properties as a candidate to be taken by the state constituted mere planning, which did not amount to an unconstitutional taking. Moreover, the trial court concluded that there was no confiscation under the alternate balancing test articulated in *Bauer* v. *Waste Management of Connecticut, Inc.*, 234 Conn. 221, 256, 662 A.2d 1179 (1995), because the plaintiffs had failed to demonstrate that the properties had lost all their "use and value" because of the defendant's action.[18] Accordingly, the trial court rendered judgment for the defendant. This appeal followed.

The plaintiffs claim that: (1) the trial court's critical finding adverse to them, namely, that they had not established that the defendant's action rendered their property without economic value, was clearly erroneous; (2) as a matter of law, the evidence satisfied the alternative test for a taking under the Connecticut constitution, namely, the balancing test; and (3) the trial court's conclusion that mere planning does not constitute a taking is flawed. We conclude that: (1) mere governmental planning and temporary steps in anticipation of condemnation of property do not constitute a constitutional taking under either the practical confiscation or the balancing test; and (2) the defendant's conduct did not go beyond such planning and steps. This conclusion renders it unnecessary to discuss either of the plaintiffs' first two claims.[19]

---

[18] The trial court also found, however, that for the period of time that the siting announcement was in effect, had there been a taking, the twelve lots in Ellridge Estates would have suffered a loss of $480,000, the value of the lots outside the designated area would have been reduced by $170,000, and the Pinney Street property would have suffered $65,000 in loss of value.

[19] Although, in view of our conclusions of law regarding the effect of mere governmental planning, it is not necessary to discuss the plaintiffs' factual claims, we refer briefly to those claims only to respond to certain factual assertions in the dissenting opinions. Justice Berdon in his dissent states: "[N]o one purchased a house on the investment property in the wake of this announcement"; "every expert witness at trial testified that the announcement stripped the investment property of essentially all of its

We first note that both the fifth amendment to the United States constitution, as applied to the states through the due process clause of the fourteenth amendment, and article first, § 11, of our state constitution, provide that private property shall not be taken for public use without just compensation therefor. The plaintiffs brought their claim of inverse condemnation solely under the Connecticut constitution and, therefore, we limit our analysis to that provision.[20]

The plaintiffs claim that our holding in *Textron, Inc.* v. *Wood*, 167 Conn. 334, 350, 355 A.2d 307 (1974)—that

value"; and "the defendant's own expert . . . testified that it was impossible for the plaintiffs to sell houses on the investment property (and, hence, generate any revenue) for two years after the announcement." Justice McDonald in his dissent states that the defendant's conduct "totally interfer[ed] with the plaintiffs' investment backed expectations to develop the property for residential purposes."

It suffices to say that these factual assertions are not supported by the record, and are inconsistent with the extensive factual findings of the trial court, which *are* supported by the evidence in the case. In brief, the trial court made a critical factual finding adverse to the plaintiffs' claims, namely, that they had not met their burden of proving that the siting announcement deprived their properties of all economically viable use during the period in which they claimed a temporary taking. Our thorough review of the record indicates that this finding, as well as other critical factual findings adverse to the plaintiffs' claims, are fully supported by the record.

[20] In their brief on appeal, the plaintiffs argue that we may not interpret the Connecticut constitution so as to provide less protection for individual rights in the use of property than what they refer to as a "minimum, national standard for protection of individual rights in the use of property" as furnished by "the fifth amendment." In the plaintiffs' view, the constitutional doctrine that the federal constitution provides "minimum, national" standards means that, when the United States constitution is interpreted to grant rights thereunder, our state constitution must be interpreted to grant at least the same level of protection as that granted by the federal constitution. What is meant by that doctrine, however, is irrelevant in this case. None of the parties argues that our state constitution provides different protection for property owners from that afforded by the federal constitution. Furthermore, we are not aware of any doctrine, cases or reason that would compel, in the context of this case, the treatment of the plaintiffs' state constitutional claims different than the treatment those claims would have been given had we been adjudicating the plaintiffs' claims under the federal constitutional takings jurisprudence. We, therefore, assume for the purposes of this appeal

as a matter of law mere governmental planning does not constitute a taking—cannot survive current federal takings jurisprudence. The defendant argues that *Textron, Inc.*, is still good law. We agree with the defendant.

In *Textron, Inc.*, the plaintiff, which owned a manufacturing plant on John Street in New Britain, was notified in August, 1962, by the state highway department that Route 72, a proposed state highway, might pass through all or a part of the John Street property. In November, 1965, the department informed the plaintiff that Route 72 in fact would do so. The department also informed the plaintiff that the taking lines had been fixed, that they could not be changed, and that the plaintiff would be required to vacate the property by 1967. Id., 336–37. In addition, in 1966, the department advertised for construction bids and filed a map of the planned highway with the New Britain town clerk. Id., 338. In 1967, the department informed the plaintiff that actual highway construction would begin in 1969, and would take two years to complete. For several years thereafter, the department reiterated its intention to initiate formal condemnation proceedings by filing an assessment of damages as provided in General Statutes § 13a-73 (b).[21] The department did not file the assessment of damages, however, until 1973. *Textron, Inc.* v. *Wood*, supra, 167 Conn. 338–39.

---

that article first, § 11, of our state constitution affords the same protection as that provided under its federal counterpart.

[21] General Statutes § 13a-73 (b) provides: "The commissioner may take any land he finds necessary for the layout, alteration, extension, widening, change of grade or improvement of any state highway or for a highway maintenance storage area or garage and the owner of such land shall be paid by the state for all damages and the state shall receive from such owner the amount or value of all benefits resulting from such taking, layout, alteration, extension, widening, change of grade or other improvement. The use of any site acquired for highway maintenance storage area or garage purposes by condemnation shall conform to any zoning ordinance or development plan in effect for the area in which such site is located, provided the commissioner may be granted any variance or special exception as may be made pursuant to the zoning ordinances and regulations of the town wherein any such site is to be acquired. The assessment of such damages

On the basis of these facts, we concluded that the trial court properly had determined that the property had been taken, in a constitutional sense, in 1966. Id., 350. We stated that, short of the filing of an assessment of damages under the statute and short of a physical appropriation of the property by the state, either of which would constitute a traditional taking, a taking also may occur where there is "a substantial interference with private property which destroys or nullifies its value or by which the owner's right to its use or

and of such benefits shall be made by the commissioner and filed by him with the clerk of the superior court in the judicial district in which the land affected is located, and such clerk shall give notice of such assessment to each person having an interest of record therein by mailing to each a copy of the same, postage prepaid, and, at any time after such assessment has been made by said commissioner, the physical construction of such layout, alteration, extension, widening, maintenance storage area or garage, change of grade or other improvement may be made. If notice cannot be given to any person entitled thereto because his whereabouts or existence is unknown, notice may be given by publishing a notice at least twice in a newspaper published in the judicial district and having a daily or weekly circulation in the town in which the property affected is situated. Any such published notice shall state that it is a notice to the last owner of record or his surviving spouse, heirs, administrators, assigns, representatives or creditors if he is deceased, and shall contain a brief description of the property taken. Notice shall also be given by mailing to each such person at his last-known address, by registered or certified mail, a copy of such notice. If, after a search of the land and probate records the address of any interested party cannot be found, an affidavit stating such facts and reciting the steps taken to establish the address of any such person shall be filed with the clerk of the superior court and accepted in lieu of service of such notice by mailing the same to the last known address of such person. Upon filing an assessment with the clerk of the superior court, the commissioner shall forthwith sign and file for record with the town clerk of the town wherein such real property is located a certificate setting forth the fact of such taking, a description of the real property so taken and the names and residences of the owners from whom it was taken. Upon the filing of such certificate, title to such real property in fee simple shall vest in the state of Connecticut except that, if it is so specified in such certificate, a lesser estate, interest or right shall vest in the state. The commissioner shall permit the last owner of record of such real property upon which a residence is situated to remain in such residence, rent free, for a period of one hundred twenty days after the filing of such certificate."

enjoyment is in a substantial degree abridged or destroyed." Id., 346. We stated further that "[t]he situations in which the concept of de facto condemnation applies, however, are limited: Mere planning by a government body in anticipation of the taking of land for public use and preliminary steps taken to accomplish this without the statutory filing of condemnation proceedings and without physical taking is not actionable by the owner." Id.

Moreover, we pointed out that, in order for there to be such a substantial interference involving "the invasion of some specific legal interest in the property," there must have been a "definitive indication that the state's intent to condemn the property in question has become fixed and irreversible." Id., 348. The reason for this requirement of such a definitive, fixed and irreversible intention is twofold: (1) once the state has reached such a final decision, "no one, not even the federal government, can interfere with the sovereign's right to properly exercise its power of eminent domain"; id.; and (2) without such a requirement, both the state and the property owner would be deprived "of the capacity to reasonably gauge their respective rights and effectively plan their future activities." Id., 349.

Applying these principles to the facts of the case, we held that by 1966, "the state highway department's intention to take the plaintiff's property had become irreversible." Id., 350. We held, "in view of the exceptional and extraordinary circumstances presented by the facts of this case, that the prohibitory statements, decisions and actions by the defendant evidenced an unequivocal intention to take the plaintiff's property, to the point where the landowner's capacity to freely dispose of that property was for all practical purposes effectively arrested; constituted a 'substantial interference' with its property rights; and amounts to a taking of the property in a constitutional sense." Id.

The line that this court drew in *Textron, Inc.*, therefore, was between, on one hand, mere governmental planning and preliminary steps in anticipation of condemnation, and, on the other hand, a fixed and irreversible decision by the state to exercise its power of eminent domain regarding the property in question. In our view, contrary to the assertion of the plaintiffs, that line has not been erased by subsequent United States Supreme Court takings jurisprudence, and, as a matter of constitutional takings policy, the line continues to make good sense.

None of the cases on which the plaintiffs rely for their assertion is inconsistent with *Textron, Inc.* In *First English Evangelical Lutheran Church* v. *Los Angeles County*, 482 U.S. 304, 321, 107 S. Ct. 2378, 96 L. Ed. 2d 250 (1987), the court held that the fifth amendment requires compensation as a remedy for a temporary regulatory taking. In that case, the county had enacted, effective immediately, an interim flood protection ordinance that, the plaintiff claimed in its action for compensation in the state courts, denied it all use of its property. Id., 311. The California courts held, however, that a landowner who claimed to be aggrieved by a regulatory taking could not obtain compensation until it had *first* secured a final adjudication that the challenged regulation was invalid and the government, thereafter, nevertheless continued the regulation in effect. Id., 312. The United States Supreme Court held, contrary to the county's position, that the fifth amendment, as applicable to the states through the fourteenth amendment's due process clause, requires compensation for a temporary regulatory taking; id., 318; and that the landowner need not wait until a challenged ordinance ultimately has been held invalid in order to obtain that compensation. Id., 320.

*First English Evangelical Lutheran Church* is not, as the plaintiffs maintain, inconsistent with our decision

in *Textron, Inc.* Indeed, in *First English Evangelical Lutheran Church* the court reiterated "the unexceptional proposition that the valuation of property which has been taken must be calculated as of the time of the taking, and . . . *depreciation in value of the property by reason of preliminary activity is not chargeable to the government.*" (Emphasis added.) Id. Thus, the court implicitly recognized the same line that we drew in *Textron, Inc.*

The plaintiffs argue, nonetheless, that "if no taking can occur until the government's decision to acquire property becomes fixed and irreversible, then a temporary taking—one in which the government *reverses* itself—can never occur." (Emphasis in original.) This argument is flawed because it overstates the meaning of irreversibility in our takings jurisprudence. Once the government has passed beyond the stage of planning and preliminary steps, and decided *definitely* and *unequivocally* to take a landowner's property, under *Textron, Inc.*, an inverse condemnation has taken place, and the landowner's loss must be measured from that date. The fact that, at some later date, the government reverses its course and abandons what it considered at the earlier date to be a fixed and irreversible decision, would not relieve the government of its obligation to pay compensation for the previously accomplished temporary taking. That does not mean, however, as the plaintiffs suggest, that the line drawn in *Textron, Inc.*, is no longer constitutionally valid.

The plaintiffs also argue that because the defendant was required by federal and state law to design and implement the designation process, its action satisfied the *Textron, Inc.*, test. We disagree. The concept of irreversibility as articulated in *Textron, Inc.*, applies to the state's decision to condemn the defendant's property, not to the fact that the planning process is required by law.

The other cases on which the plaintiffs rely do not support their assertion because none of them involves mere planning by the government. See, e.g., *Dolan* v. *Tigard*, 512 U.S. 374, 377, 114 S. Ct. 2309, 129 L. Ed. 2d 304 (1994) (dedication of property required as condition of securing permit); *Lucas* v. *South Carolina Coastal Council*, 505 U.S. 1003, 1007–1008, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992) (enactment of statute prohibiting coastal habitable improvements); *Penn Central Transportation Co.* v. *New York City*, 438 U.S. 104, 109, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978) (enactment of statute barring alteration of landmark property).

Furthermore, we are persuaded that the policies behind the *Textron, Inc.*, demarcation remains sound. First, as we have explained, once the state has reached a final decision, no one can interfere with its sovereign right properly to exercise its power of eminent domain, and without the *Textron, Inc.*, line the state and private property owners would be deprived of the ability to gauge their respective rights and to plan their future activities. *Textron, Inc.* v. *Wood*, supra, 167 Conn. 348–49. Furthermore, if the government were to be considered as having accomplished a compensable taking as a result of mere planning that, because of its publicity, harmed the value of property, public planning would be discouraged, and governmental secrecy in the planning process would be encouraged. Neither course strikes us as wise public policy, or as constitutionally mandated by the just compensation clause. Governmental planning is necessary to wise governmental conduct, and public planning—yielding public scrutiny and comment—is generally considered likely to yield a better ultimate result than secret, unscrutinized official activity.

It is true that, in some cases, the public planning process may result in a landowner's property value

being significantly harmed, either before the ultimate taking occurs or, if for some reason the taking never does occur, on a temporary basis. The line that we drew in *Textron, Inc.*, however, strikes an appropriate balance between that risk to landowners and the concomitant need to preserve the governmental planning process as a matter of sound public policy.

The plaintiffs argue, however, that, even given the *Textron, Inc.*, line, in the present case, the defendant's conduct went beyond mere planning and preliminary steps, and demonstrated a fixed and irreversible intent to take their property. The record demonstrates the contrary.

It is undisputed that the selection process narrowed the defendant's range of choices to three potential sites, with one of the three to be selected as the ultimate disposal site. Further study was necessary before any such final choice was to be made, particularly regarding whether on any such site there were exclusionary characteristics that would preclude it from being selected as the preferred site. Moreover, there were several administrative requirements to be met in order for the preferred site finally to be selected for construction of the disposal facility. These included permits from the federal Nuclear Regulatory Commission, the department of environmental protection, the siting council, and local planning, zoning and wetlands agencies. In addition, no witness who testified regarded the plaintiffs' property as the final site for the disposal facility. In fact, there was testimony to the contrary. Bruce Caganello, an officer of the Connecticut Association of Realtors, testified that the association had issued a memorandum for realtors to inform potential buyers that the designated sites were merely under consideration and that it was not certain that any one site would be selected. Also, Ronald Gingerich, the state's director of the low-level radioactive waste program, testified

that the defendant had not made a fixed and irreversible decision to take the plaintiffs' property.

The defendant's conduct consisted of nothing more, in a constitutional sense, than planning and temporary steps in anticipation of condemnation of some property, not necessarily that of the plaintiffs. Therefore, the defendant's conduct did not constitute a taking of the plaintiffs' property.

The judgment is affirmed.

In this opinion CALLAHAN, C. J., and NORCOTT, KATZ and PALMER, Js., concurred.

BERDON, J., dissenting. The opinion that the majority has rendered today disregards a foundational principle of our democracy: the constitution imposes substantial restraints upon the harms that the state may impose upon individuals without just compensation. See *First English Evangelical Lutheran Church* v. *Los Angeles County*, 482 U.S. 304, 321, 107 S. Ct. 2378, 96 L. Ed. 2d 250 (1987) (constitution in general and takings clause in particular "designed to limit the flexibility and freedom of governmental authorities"). For this reason, I dissent and also join in Justice McDonald's dissent.

The facts of the present case are straightforward. The plaintiffs, Evandro S. Santini and Santini Homes, Inc., invested a substantial amount of money developing two parcels of land, one of which is known as Ellridge Estates and the other an adjoining parcel referred to as the Pinney Street property (collectively, the investment property), for the purpose of constructing and selling houses. The defendant, Connecticut Hazardous Waste Management Service—which is a "political subdivision of the state"[1]—publicly announced that it was about to select a site for the disposal of radioactive waste, and that the investment property was one of three finalist

---

[1] General Statutes § 22a-134bb (a).

locations (announcement). Not surprisingly, no one purchased a house on the investment property in the wake of this announcement.[2] Moreover, every expert witness at trial testified that the announcement stripped the investment property of essentially all of its value because neither the houses nor the property could be sold while the designation as a radioactive waste disposal area was in effect. And for good reason: as the trial court found, "[s]uch waste remains radioactive for many years and is hazardous to human health."[3]

[2] In the wake of the June 10, 1991 announcement, the plaintiffs encountered significant difficulty selling houses. On November 4, 1991, the plaintiffs received an offer from Jeffrey Zoufaly for "half the price." It was not until April 23, 1992, that the parties signed a purchase agreement with the knowledge that the legislature would soon vote on whether to rescind the designation of the plaintiffs' investment property as a potential site for the disposal of radioactive waste. Indeed, the agreement was contingent upon the legislature's decision not to designate the investment property as such a site. The legislature rescinded the designation on May 5, 1992. The sale to Zoufaly was finalized on August 11, 1992, more than one year after the June 10, 1991 announcement and three months after the rescission of the designation. The house sold for $530,000. The trial court noted that "[w]hen home sales resumed, the plaintiffs were required to provide minor incentives to achieve sales." These incentives were not minor. For example, in order to consummate the sale with Zoufaly, the plaintiff Evandro Santini was required to advance cash at the closing because he had to purchase Zoufaly's prior residence, Zoufaly assumed an existing mortgage of $300,000 on the new house (on which Santini remained liable), Santini took back a second mortgage in the amount of $150,000, and a third mortgage in the amount of $45,000.

[3] The majority contends that my statements are unsupported by the record. First, common sense would dictate that no one in his or her right mind would want to purchase a house next to or near a site that could be developed as a radioactive waste facility. Further, this court can take judicial notice of this fact. See C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 6.1.2 (a) ("[j]udicial notice is a function that appertains to every court, from the lowest to the highest, both trial and appellate").

Moreover, the majority ignores the expert witnesses for both the plaintiffs and the defendant who testified regarding the effect of the June 10, 1991 announcement on the value of the houses and property. Bruce Cagenello, a real estate broker who was testifying on behalf of the plaintiffs, addressed the announcement's effect on the market for the property. He opined that "the property was definitely dysfunctional at that time. The market is made up of willing buyers and willing sellers. In fact, one of the definitions of value is what a willing buyer is willing to pay for a property and what a

## Significantly, the defendant's own expert, William N. Kinnard, Jr., testified that it was impossible for the

willing seller is willing to sell a property for without any gun to their heads. And there just was no buyer at that point for this property . . . ." Cagenello added that "[t]he fear—fear is a big demotivator and a motivator, and people—I think everyone can relate to the fact that when you buy a home, you want to make sure that your investment is not going to be lost—and fear of safety, fear of values. And this particular project was right on top of the site, and it was the site. It wasn't a nearby site. I mean, everyone in the area, from people with whom I talked, were concerned about that whole area, but when you're talking right on the site, you were not going to be—in my opinion, be able to sell it on a functional market." Ronald Gingerich, the director of the low-level radioactive waste program for the defendant conceded that he "heard from the real estate board for that area at a hearing sometime after the siting announcement . . . that it basically brought the real estate market close to . . . the sites to a halt." Edward Heberger, a real estate appraiser who was testifying on behalf of the plaintiffs, evaluated the value of the Pinney Street property and concluded that "[the plaintiffs] probably couldn't sell the property for two years because of the designation and the stigma period thereafter. And I felt it was a twenty-four month period." Regarding Ellridge Estates, Heberger stated that the fair market value from June, 1991, to June, 1993, was "[e]ssentially zero . . . . [T]here could have been some residual value there, but very little could be done with it."

The defendant's own expert witnesses acknowledged that the announcement had a negative impact upon the investment value. Donald E. Mullane, a real estate appraiser, made his assessments of the value based on the assumption that the designation issue would be resolved by rescinding the designation. He noted that "the market went into paralysis. Pending some sort of resolution [regarding] what was going to happen with these sites." Leonard Sucsy, a real estate developer who was called to testify for the defendant, agreed that the designation could have prevented the house and property sales at Ellridge Estates. William N. Kinnard, Jr., a property evaluation consultant and real estate market analyst, appraised the fair market value of the Ellridge Estates property after the announcement. Referring to a report he helped prepare on the project; see footnote 4 of this dissent; Kinnard testified that "no sales [of the Ellridge Estates property] could reasonably have expected to have occurred and no development activity on the Pinney Street property could reasonably have been expected to occur" during the designation period. He further testified, summarizing his previous deposition testimony, that there was a negative impact on sales of the investment property because there was "one chance in three" that it would be chosen as the ultimate site and "it simply doesn't make sense to go voluntarily into an area in which there is a reasonable possibility—reasonable probability as perceived at that time that the property would be taken through eminent domain proceedings."

plaintiffs to sell houses on the investment property (and, hence, generate any revenue) for two years after the announcement.[4] Even the majority grudgingly acknowledges that "[t]he announcement caused some negative effects on the [plaintiffs'] real property sales . . . ." This is clearly an understatement. As the plaintiffs aptly stated in the brief that they submitted to this court, "new homes and radioactive waste do not mix."

Indeed, as the trial court specifically found and the majority conveniently ignores, for the period when the investment property was designated as one of three possible parcels as a repository for radioactive waste, the plaintiffs suffered significant damages. The trial court found as a result of the announcement that the diminution of value of the Ellridge Estates portion of the investment property amounted to $650,000, and the diminution of the Pinney Street portion amounted to

---

[4] At the state's request, Kinnard, together with Mary Beth Geckler of the Real Estate Counseling Group of Connecticut, developed a "Summary Appraisal Report and Estimate of Damages." As part of this report, they assessed the effect of the June 10, 1991 designation of the properties as a potential site for a low-level radioactive waste disposal facility until this designation was rescinded in May, 1992. They concluded that "[d]uring that period of time, no sales of any portion of Ellridge Estates (vacant lots with the designated site area of the facility; or vacant houses, immediately abutting the designated site area) could reasonably be expected to have occurred. Moreover, no development activity on the Pinney Street property could reasonably have been expected to occur." Kinnard reiterated this conclusion in his testimony before the trial court. See footnote 3 of this dissent. The report also concluded that the general decline in market demand occurring at the time was compounded by the announcement. Kinnard and Geckler, in the report, "concluded that the [defendant's] announcement resulted in an effective delay or hiatus in marketing and development activities for the [investment property] of an additional nine (9) months. In brief, we have concluded that the most likely start-up date for effective marketing and sales in the 3 segments of the [investment property] in Ellington would be June 1993. That is the end of the Second Quarter of 1993, and 24 months from the [defendant's] announcement date." Thus, the state's own expert witness concluded that the announcement in combination with general market conditions made marketing and sales activities impossible for two years.

$65,000, in all $715,000.[5] The opinion of both the majority and the trial court can be understood only if compensation for the "stigma period" is rejected. This, however, requires that we ignore clearly defined federal law. "[W]here the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective." *First English Evangelical Lutheran Church* v. *Los Angeles County*, supra, 482 U.S. 321; see also *Lucas* v. *South Carolina Coastal Council*, 505 U.S. 1003, 1030 n.17, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992).

Both the federal and state constitutions explicitly provide that, when the state takes private property for public use, it must pay "just compensation" for this invasion.[6] Notwithstanding the obvious nexus between the announcement and the undisputed harm that the plaintiffs have suffered, the majority believes that the defendant was not required to provide the plaintiffs with "just compensation." The majority reaches this conclusion for the following reason: the defendant did not possess "a fixed and irreversible intent to take the plaintiffs' [investment] property," as opposed to one of the two other finalist locations. I recognize that the

[5] The trial court found "that the total diminution in value of the twelve Ellridge Estates lots was $480,000. The loss for the lots outside the notice areas would have been $170,000 but of course they were not part of any suggested taking. The court finds that the total diminution of the Pinney Street property if the state were liable was $65,000 for a twenty-four month period. That time period includes the so-called 'stigma period.'"

[6] "The Fifth Amendment provides 'nor shall private property be taken for public use, without just compensation,' and applies to the States through the Fourteenth Amendment." *First English Evangelical Lutheran Church* v. *Los Angeles County*, supra, 482 U.S. 310 n.4. Article first, § 11, of the Connecticut constitution provides: "The property of no person shall be taken for public use, without just compensation therefor." The majority "assume[s] for the purposes of this appeal that article first, § 11, of our state constitution affords the same protection as that provided under its federal counterpart."

majority's reliance upon the "fixed and irreversible intent" finds support in a case that this court decided twenty-five years ago. See *Textron, Inc.* v. *Wood,* 167 Conn. 334, 348, 355 A.2d 307 (1974). In my view, however, this reliance finds no support in the constitution, in common sense, or in the interests of justice. Accordingly, I believe that we should take this opportunity to reject the fixed and irreversible intent standard.

" '[T]he Constitution measures a taking of property not by what a State says, *or by what it intends [to do],* but by what it *does.' Hughes* v. *Washington,* 389 U.S. 290, 298 [88 S. Ct. 438, 19 L. Ed. 2d 530] (1967) (Stewart, J., concurring) . . . see *Davis* v. *Newton Coal Co.,* 267 U.S. 292, 301 [45 S. Ct. 305, 69 L. Ed. 617] (1925)." (Emphasis altered.) *San Diego Gas & Electric Co.* v. *San Diego,* 450 U.S. 621, 652–53, 101 S. Ct. 1287, 67 L. Ed. 2d 551 (1981) (Brennan, J., dissenting). This is the only sensible approach to the law of takings. If the state has destroyed the value of a person's property, no difference of constitutional magnitude inheres in the question of whether the state intended to do so. Under our law, the requirement of a particular state of mind is appropriate only when we are attempting to determine whether a transgressor was morally responsible for a harmful act, and hence deserving of punishment. The takings clause of the constitution is not a criminal sanction; the courts are not asked to find the state "guilty" of a taking. Instead, the mens rea of the state—assuming that it can be divined—has nothing to do with an individual's right to invoke the constitutional guarantee of just compensation for harms inflicted by the state.[7]

---

[7] Even if it were rational to focus upon the intent of the state, it would nevertheless be irrational to embrace the criterion of a "fixed and irreversible" intention. "Nothing in the Just Compensation Clause suggests that 'takings' must be permanent and irrevocable." *San Diego Gas & Electric Co.* v. *San Diego,* supra, 450 U.S. 657 (Brennan, J., dissenting); see id. ("the temporary [and] reversible quality of a regulatory 'taking' [does not] render compensation for the time of the 'taking' any less obligatory"). If a taking need not be permanent and irrevocable, I am at a loss to understand why the state's intent to commit a taking must be fixed and irreversible, as the

The majority concedes that "[i]t is undisputed that the selection process narrowed the defendant's range of choices to three potential sites"—one of which was the investment property—"with one of the three to be selected as the ultimate disposal site" of radioactive waste. The majority also concedes that the announcement caused "some[8] negative effects" on the plaintiffs' real property sales. In the face of these two facts, the majority nevertheless argues that the plaintiffs are not entitled to just compensation, because "it was not certain" that the investment property—as opposed to one of the other two finalist locations—would be selected for the disposal of radioactive waste. This is like saying that Russian roulette is a harmless entertainment, because "it is not certain" that the gun will fire a fatal shot when you pull the trigger. It literally is true, but it is worlds apart from not having a loaded gun aimed at your temple in the first place. Although it was not 100 percent "certain" that the investment property would be used for the disposal of radioactive waste, there was a one-in-three chance that the state would put it to that use. These odds were less than a sure thing, but they were more than enough to deter any rational buyer from purchasing a house from the plaintiffs.

Finally, my colleagues in the majority argue that the rule that they embrace comports with public policy. On this point, as with many others, I agree with the response of Justice Brennan, who, in the very context of the takings clause, made the following eloquent statement: "[T]he applicability of express constitutional guarantees is not a matter to be determined on the basis of policy judgments made by the legislative, executive, or judicial branches. Nor can the vindication of those

---

majority claims, before a private property owner may recover just compensation.

[8] The adjective "some" is used by the majority notwithstanding the trial court's finding of $715,000 damages.

rights depend on the expense in doing so. See *Watson* v. *Memphis*, 373 U.S. 526, [537–38, 83 S. Ct. 1314, 10 L. Ed. 2d 529] (1963)." *San Diego Gas & Electric Co.* v. *San Diego*, supra, 450 U.S. 661 (Brennan, J., dissenting). It is for this reason that my colleagues in the majority bark up the wrong tree by attempting to balance a constitutional wound to an individual's interest in private property against what the majority characterizes as "good sense" and "sound public policy."[9]

Accordingly, I dissent.

MCDONALD, J., with whom BERDON, J., joins, dissenting. I join in Justice Berdon's dissent. The holding of the majority that government action must be irreversible to be a taking of private property has much to commend itself in terms of certainty. The majority, however, fails to properly recognize the rights of owners who are affected in a dramatic and adverse way by the government's action, even temporarily.

When *Textron, Inc.* v. *Wood*, 167 Conn. 334, 355 A.2d 307 (1974), upon which the majority relies, was decided in 1974, Justice Brennan had yet to begin his crusade in the United States Supreme Court to bring temporary takings within the takings clause of the United States

---

[9] As Justice Brennan stated in his dissent in *San Diego Gas & Electric Co.* v. *San Diego*, supra, 450 U.S. 661 n.26, "[e]ven if I were to concede a role for policy considerations, I am not so sure that they would militate against requiring payment of just compensation. Indeed, land-use planning commentators have suggested that the threat of financial liability for unconstitutional police power regulations would help to produce a more rational basis of decisionmaking that weighs the costs of restrictions against their benefits. Dunham, 'From Rural Enclosure to Re-Enclosure of Urban Land,' 35 N.Y.U. L. Rev. 1238, 1253–1254 (1960). Such liability might also encourage municipalities to err on the constitutional side of police power regulations, and to develop internal rules and operating procedures to minimize overzealous regulatory attempts. Cf. *Owen* v. *City of Independence*, 445 U.S. 622, [651–52, 100 S. Ct. 1398, 63 L. Ed. 2d 673] (1980). After all, if a policeman must know the Constitution, then why not a planner? In any event, one may wonder as an empirical matter whether the threat of just compensation will greatly impede the efforts of planners. Cf. id., [656]."

constitution. It was not until Justice Brennan's dissent in *San Diego Gas & Electric Co.* v. *San Diego*, 450 U.S. 621, 636, 101 S. Ct. 1287, 67 L. Ed. 2d 551 (1981), which later became law in *First English Evangelical Lutheran Church* v. *Los Angeles County*, 482 U.S. 304, 107 S. Ct. 2378, 96 L. Ed. 2d 250 (1987), that temporary takings were recognized under the takings clause of the United States constitution. In *First English Evangelical Lutheran Church*, the ordinance denied the appellant all use of its property temporarily, and the United States Supreme Court held that invalidation of the ordinance was not a sufficient remedy for the property owner. Id., 319. The court held that takings, even when temporary, must be compensated. Id., 318.

In *Penn Central Transportation Co.* v. *New York*, 438 U.S. 104, 130–31, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978), the United States Supreme Court clarified the factors causing a government regulation to become a taking: (1) the economic impact of the regulation on the property owner; (2) the regulation's interference with the property owner's investment backed expectations; and (3) the character of the governmental action.

In the case before us, notwithstanding the fact that the property later was not chosen as the site for the disposal of radioactive waste, the plaintiff property owners, Evandro S. Santini and Santini Homes, Inc., suffered severe economic impact, totally interfering with their investment backed expectations to develop the property for residential purposes. In 1991, there were three operating low-level radioactive waste disposal facilities, in Washington, Nevada and South Carolina, that alone accepted all of the low-level radioactive waste produced nationally. Like people in the remaining states who opposed siting designations in their own states, the people of Connecticut never welcomed such a site within this state. The resistance to the introduction of a "low-level" radioactive waste site anywhere

in Connecticut shows beyond rational argument that individuals would not seek to purchase homes and live near such a site. Common sense dispels any argument that the designation of the plaintiffs' property as one of these sites did not totally interfere with the plaintiffs' investment backed expectations to develop the property for residential purposes. The trial court's finding that the evidence before it did not require such a conclusion is clearly erroneous. See, e.g., *Poulos* v. *Pfizer, Inc.*, 244 Conn. 598, 616, 711 A.2d 688 (1998). It is simply inconceivable that a "Chernobyl[1] Estates" could be a successful real estate development in Connecticut. Thus, I conclude in light of *Penn Central Transportation Co.*, *First English Evangelical Lutheran Church* and, more recently, *Lucas* v. *South Carolina Coastal Council*, 505 U.S. 1003, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992), that when, because of the impact on their distinct investment backed expectations, property owners like the plaintiffs are forced to sacrifice all economically beneficial uses of their property, even temporarily, a taking that requires just compensation has occurred.

Accordingly, I dissent.

---

[1] Chernobyl, in the Ukraine region of the former Soviet Union, was the site of a nuclear meltdown on April 26, 1986, that resulted in the release of deadly radioactive material into the atmosphere.