Evandro S. SANTINI and Santini
Homes, Inc., Plaintiffs–
Appellants,

v.

CONNECTICUT HAZARDOUS WASTE
MANAGEMENT SERVICE,
Defendant–Appellee.

Docket No. 02–9150.

United States Court of Appeals,
Second Circuit.

Argued: June 16, 2003.

Decided: Aug. 28, 2003.

**120**

Timothy S. Hollister (Patrick M. Fahey, on the brief), Shipman & Goodwin LLP, Hartford, CT, for Plaintiffs–Appellants.

Robert D. Snook, Assistant Attorney General, for Richard Blumenthal, Attorney General of the State of Connecticut, Hartford, CT, for Defendant–Appellee.

Mark A. Chertok, Sive, Paget & Riesel, P.C., New York, NY (Duane Desiderio and Mary Lynn Pickel, National Association of Home Builders, Washington, D.C., Michael M. Berger, Berger & Norton, Los Angeles, CA, and William H. Ethier, HBA of Connecticut, Inc., West Hartford, CT, of counsel), filed a brief for Amici Curiae National Association of Home Builders and Home Builders Association of Connecticut, Inc. in support of plaintiffs-appellants.

Before: NEWMAN, WINTER, and B.D. PARKER, JR., Circuit Judges.

B.D. PARKER, JR., Circuit Judge.

In this appeal, Evandro S. Santini and his real estate development firm, Santini Homes, Inc., challenge a judgment of the United States District Court for the District of Connecticut (Warren W. Eginton, *Judge*) in favor of the Connecticut Hazardous Waste Management Service (the "Service"). After unsuccessfully pursuing a state-law takings claim in the Connecticut courts, Santini sued in federal court, alleging that the Service's announcement that his property was one of three sites under consideration for the location of a low-level radioactive waste disposal facility constituted a taking without just compensation in violation of the Fifth Amendment.[1] The District Court dismissed Santini's complaint on three grounds: the *Rooker–Feldman* doctrine,[2] collateral estoppel, and the merits of the takings claim.

---

1. The Fifth Amendment provides, in part, "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The takings clause of the Fifth Amendment is made applicable to the states through the Fourteenth Amendment. *See,*

*e.g., Dolan v. City of Tigard,* 512 U.S. 374, 383–84 & n. 5, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994).

2. *See Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *Dis-*

Because Santini did not raise, and could not have raised, his federal takings claim in the state court action, we conclude that the *Rooker–Feldman* doctrine and res judicata do not apply. Moreover, we recognize an exception to the applicability of collateral estoppel for plaintiffs who litigate state-law takings claims in state court solely to comply with the ripeness requirement of *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), as Santini did. We hold that litigants who pursue inverse condemnation actions in state court in order to comply with *Williamson County* may reserve their federal takings claims for later resolution in federal court. Because we announce this reservation rule for the first time, we apply the requirement prospectively only and deem Santini to have reserved his federal claim, rendering collateral estoppel inapplicable. But because we believe that the Service is entitled to summary judgment on the merits of Santini's takings claim, we affirm the judgment of the District Court.

## BACKGROUND

The material facts are undisputed. Santini develops residential real estate in the area surrounding Hartford, Connecticut. In 1985, he purchased, for $147,500, a 20.3–acre parcel of land in Ellington, Connecticut. Santini obtained approval from the Ellington Planning and Zoning Commission to subdivide the parcel, to be known as Ellridge Estates, into sixteen lots. Beginning in 1985, Santini built an access road to the development, installed storm drainage and sewer systems, and, in all, spent approximately $500,000 developing infrastructure.

In 1988, Santini purchased, for $1,075,000, a 54.6–acre parcel (the "Pinney Street property") adjacent to the Ellridge Estates parcel, intending to develop the two parcels into a unified 75–acre residential village consisting of approximately 100 homes. Santini began building model homes in 1987, constructing houses on four lots of the Ellridge Estates parcel. He also made other investments in the properties, including completing engineering studies and preliminary layouts for the Pinney Street property and borrowing funds for the construction of its infrastructure. Because of a recession in the real estate market, construction proceeded slowly until 1991. When market conditions improved, Santini renewed his efforts to sell homes in Ellridge Estates: he lowered prices, established a mortgage program customized to the development, and began advertising aggressively. By June 1991, he had identified likely buyers for two of the homes, spent $5 million in acquiring and developing the Ellington properties, and borrowed $4.7 million that was earmarked for further construction on the Pinney Street property.

The Service is a quasi-public governmental agency established pursuant to Connecticut General Statutes § 22a–163 *et seq.* and charged with siting a low-level radioactive waste disposal facility. The Low–Level Radioactive Waste Policy Act of 1980, 42 U.S.C. § 2021b *et seq.*, required the states to make adequate provision for the disposal of low-level radioactive waste generated within their borders by entering into regional compacts, and it imposed financial penalties on those states that failed to do so. In 1986, with few states complying with the Act, Congress passed the Low–Level Radioactive Waste Policy

*trict of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983) (holding that inferior federal courts have no jurisdiction over cases that effectively seek review of state court judgments).

Amendments Act, 42 U.S.C. § 2021b *et seq.*, which required the states by the end of 1992 to dispose of their domestically generated radioactive waste either in-state or through compacts with other states. In order to comply with the federal requirements, Connecticut entered into a regional compact and enacted legislation directing the Service to locate a disposal facility within the state. *See* Conn. Gen.Stat. § 22a–163c (1995).

The Service developed a plan which first required it to locate sites that were likely to be suitable. Of these, the Service would then identify those sites that would actually be suitable. The list of potential sites would be winnowed to eight, with the Service's Board of Directors selecting three of the eight as finalists. Once three finalists were identified, on-site examinations would be conducted and one site would be selected as the preferred site. The preferred site would then be monitored for at least twelve months, in accordance with federal Nuclear Regulatory Commission ("NRC") regulations. *See Santini v. Conn. Hazardous Waste Mgmt. Serv.*, 251 Conn. 121, 125–26 & n. 6, 739 A.2d 680 (1999). The Service never got beyond the identification of three finalist sites.

On June 10, 1991, after secret deliberations, the Service announced that it had identified three sites. (The Service later identified five other back-up sites.) Two were located in Ellington, and the third was located in a neighboring town. One of the Ellington sites included the undeveloped portion of Santini's Ellridge Estates and the entirety of his Pinney Street property. Santini did not know, prior to the Service's June 10 announcement, that his

property was under consideration. On June 30, 1991, the three potential sites, including Santini's property, were depicted in the Hartford Courant below the international symbol for radioactivity and the headline, "Nuclear waste: Where should it go?" *The Hartford Courant,* June 30, 1991 at H5. In late 1991, the Service eliminated one of the three sites from consideration, leaving Santini's property as one of two finalists.

After vocal public opposition in and around Ellington to the Service's siting plan, the Connecticut legislature passed, and the Governor signed into law, Public Act 92–45, which directed the Service to develop a new plan for locating a disposal facility. Public Act 92–45, which took effect May 5, 1992, effectively overruled the Service's June 10, 1991 siting announcement. Ultimately, neither Santini's property nor any other Connecticut site was selected as the preferred site, a necessary prerequisite to the state's exercise of its eminent domain power to take private property such as Santini's for the construction of a disposal facility.[3]

Notwithstanding the enactment of Public Act 92–45, however, Santini's property remained economically idle until mid–1993, and he continued to incur additional carrying costs, including interest on debt and property taxes, until 1994. In 1994 Santini sued the Service in Connecticut Superior Court, alleging that its June 10, 1991 siting announcement—naming his property one of three finalists—constituted a temporary taking of his property without just compensation in violation of Article I, § 11 of the Connecticut Constitution. Santini's

---

**3.** Even if Santini's property had been designated the preferred site, it still would have had to clear a number of regulatory hurdles before becoming the location of the waste disposal facility. For example, permits from the NRC, the Connecticut Department of Environmental Protection, and the Connecticut siting council, as well as eminent domain proceedings, *see* Conn. Gen.Stat. § 22a–163w(b), (c) (1995), would have been required.

complaint alleged that the Service's siting announcement had: (1) prevented him from selling the homes and lots in Ellridge Estates; (2) prevented him from completing development of Ellridge Estates and the Pinney Street property; (3) denied him any economic return on his investments in the two parcels; (4) caused him to incur additional costs and incidental damages; and (5) left him with no alternative use of his property. Santini brought only a state-law takings claim because he believed that, under the Supreme Court's decision in *Williamson County Regional Planning Commission v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), a federal takings claim would not be ripe until he had sought, and been denied, just compensation in a state-law inverse condemnation action.[4]

The Superior Court held an eight-day bench trial in early 1998. In addition to fact witnesses, Santini and the Service both presented expert appraisal testimony concerning the economic impact of the siting announcement on Santini's property. Santini's appraiser, Edward Heberger, testified that Santini's damages as a result of the June 10, 1991 siting announcement were $890,000 for the Ellridge Estates property and $65,000 for the Pinney Street property, for a total loss of $955,000. Heberger's appraisal was based on his conclusion that the siting announcement had paralyzed Santini's construction and sales efforts for two years, a period including the eleven months that the siting designation was in effect as well as a thirteen-month "stigma period" that followed. The Service's appraiser, William N. Kinnard, Jr., testified that the siting announcement had diminished the value of the Ellridge Estates property by $185,000 and the Pinney Street property by $30,000, for a total loss of $215,000.

Following trial, the Superior Court found that, although Santini had suffered an economic loss as a result of the siting announcement, the announcement "was part of the state's planning process," and "[s]uch planning is not actionable." *Santini v. Conn. Hazardous Waste Mgmt. Serv.,* No. CV 94 0538646S, 1998 WL 422166, at *5 (Conn.Super. July 13, 1998). The Superior Court found no evidence that the state's intent to condemn Santini's property had ever become "fixed and irreversible," *id.* at *6 (citation and quotation marks omitted), and concluded that "there was no unconstitutional taking of any kind," *id.* at *7. Accordingly, the Superior Court entered judgment for the Service. *Id.*

Santini appealed to the Appellate Court of Connecticut, but before that court could act the Supreme Court of Connecticut transferred the case to itself. *Santini,* 251 Conn. at 123 n. 1, 739 A.2d 680. The Supreme Court affirmed the judgment of the Superior Court by a vote of five to two. *Id.* at 144, 151, 739 A.2d 680. Echoing the Superior Court, the Supreme Court held that the Service's siting announcement constituted "mere governmental planning and preliminary steps in anticipation of condemnation," not "a fixed and irreversible decision by the state to exercise its power of eminent domain regarding [Santini's property]." *Id.* at 140, 739 A.2d 680; *see also id.* at 144, 739 A.2d 680. The Supreme Court of the United States de-

---

**4.** "Inverse condemnation should be distinguished from eminent domain. Eminent domain refers to a legal proceeding in which a government asserts its authority to condemn property. Inverse condemnation is a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted." *Agins v. City of Tiburon,* 447 U.S. 255, 258 n. 2, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980) (citations and internal quotation marks omitted).

nied Santini's petition for certiorari. *Santini v. Conn. Hazardous Waste Mgmt. Serv.*, 530 U.S. 1225, 120 S.Ct. 2238, 147 L.Ed.2d 266 (2000).

Following his loss in state court, Santini sued the Service in the District Court, alleging a takings claim under the Fifth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. The Service moved to dismiss the complaint and for summary judgment, and Santini also moved for summary judgment. The District Court dismissed the complaint for lack of subject matter jurisdiction under the *Rooker–Feldman* doctrine, concluding that Santini's federal takings claim was inextricably intertwined with the judgment of the Connecticut Supreme Court dismissing his state-law takings claim. The court also noted that, even if *Rooker–Feldman* did not apply, it would grant the Service's motion for summary judgment on the basis of collateral estoppel and on the merits of Santini's takings claim. The court concluded that collateral estoppel barred Santini's federal takings claim because "the issue necessary to the Connecticut Supreme Court's decision—the extent or finality of the defendant's action—is identical to [the] consideration required for the instant federal takings claim." (Ruling on Mot. to Dismiss and Cross–Motions for Summ. J., Aug. 27, 2002, at 13.) The District Court also noted that the Service was entitled to summary judgment because it had not made a final decision as required by *Williamson County* and because the selection of Santini's property as one of three finalists "left open the possibility that [Santini's] property would not ultimately be selected as the radioactive disposal site." (*Id.* at 15.) This appeal followed.

## DISCUSSION

The Service defends the judgment of the District Court on three grounds. It argues that: (1) Santini's takings claim is not ripe because the Service did not make a final decision with respect to his property; (2) the District Court properly concluded that it lacked jurisdiction under *Rooker–Feldman;* and (3) Santini's takings claim is barred by res judicata and collateral estoppel. We review *de novo* the decision of the District Court, which granted the Service's motions to dismiss and for summary judgment and denied Santini's motion for summary judgment. *See, e.g., Manning v. Utils. Mut. Ins. Co.*, 254 F.3d 387, 391 (2d Cir.2001).

## I. Ripeness

■ In *Williamson County*, the Supreme Court established a two-pronged test for determining whether a Fifth Amendment takings claim is ripe. "The first prong requires the government entity charged with enforcing the regulations at issue to have rendered a 'final decision,'" and "[t]he second prong requires the plaintiff to have sought compensation if the state provides a 'reasonable, certain and adequate provision for obtaining compensation.'" *Southview Assocs., Ltd. v. Bongartz*, 980 F.2d 84, 95 (2d Cir.1992) (quoting *Williamson County*, 473 U.S. at 186, 194, 105 S.Ct. 3108). Since the Service concedes that Santini's pursuit of a state-law takings claim in the Connecticut courts satisfies the second prong, the dispute over ripeness focuses on the first prong: whether the Service rendered a final decision with respect to Santini's property.

■ Under the first *Williamson County* prong, a takings claim is not ripe until the appropriate government entity has reached a final decision regarding the property at issue. *Williamson County*, 473 U.S. at 186, 105 S.Ct. 3108. The Service argues that Santini's takings claim is unripe because it never made the "final

decision" to acquire Santini's property and to locate a disposal facility there, and because "[t]he only action by the government was a public announcement that certain sites were to be considered for possible future acquisition." (Br. of Def.-Appellee at 15.) Implicit in the finality requirement of *Williamson County* is the notion that a takings claim is unripe if, before seeking just compensation through an inverse condemnation claim, the plaintiff could have taken some action to prevent the challenged governmental regulation from depriving him of an economically viable use of his property. In *Williamson County* itself, for example, a jury had found that the respondent, Hamilton Bank of Johnson City, would be denied the economically feasible use of its property if it were forced to develop the property in conformity with each of eight objections raised by the petitioner, the Williamson County Regional Planning Commission. *Id.* at 191, 105 S.Ct. 3108. Finding the Bank's inverse condemnation claim unripe, the Supreme Court noted that "[i]t is not clear whether the jury would have found that the respondent had been denied all reasonable beneficial use of the property had any of the eight objections been met through the grant of a variance." *Id.; see also Palazzolo v. Rhode Island*, 533 U.S. 606, 620, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) (holding that regulatory takings claim was unripe until property owner had "followed reasonable and necessary steps to allow regulatory agencies to exercise their full discretion in considering development plans for the property"). Significantly, the Service does not suggest any action that Santini could have taken to "ripen" his takings claim, and we are aware of none.

*See, e.g., Hall v. City of Santa Barbara*, 833 F.2d 1270, 1281–82 n. 28 (9th Cir.1986) ("It is not clear what the city would have the Halls do to perfect their claim.... [T]he Halls have no further administrative recourse available ....").

In any event, the Service misconstrues the ripeness inquiry in two ways. First, it erroneously assumes that, under *Williamson County*, the particular governmental decision of which a takings plaintiff complains—here, the siting announcement—must itself constitute a final decision. That is not the case. Rather, the first prong of *Williamson County* requires only that the government entity *have rendered* a final decision. *See Williamson County*, 473 U.S. at 186, 105 S.Ct. 3108. Once it does so, a takings claim based on an earlier step of the regulatory process is ripe (though not necessarily meritorious). Second, the Service erroneously assumes that a takings claim is not ripe unless the government entity's final decision is adverse to the plaintiff. This assumption no doubt explains the Service's misplaced reliance on the true-but-irrelevant fact that the State of Connecticut never made the final decision to acquire Santini's property. For ripeness purposes, it does not matter that the Service's ultimate decision—not to acquire Santini's property—was favorable to Santini. Rather, all that matters is that the Service made a final decision. Thus, regardless of whether the siting announcement was itself a final decision,[5] and despite the fact that the Service never made the final decision to acquire Santini's property, the Service did made the final decision not to acquire Santini's property.

---

**5.** We take no position on whether Santini's claim would have been ripe before the state decided not to acquire his property. That is, the siting announcement itself might have constituted a final decision under *Williamson*

*County*, as Santini argues, but we need not decide that here, because the state's ultimate decision not to acquire Santini's property was undeniably final.

That is all that *Williamson County* requires.

## II. *Rooker–Feldman,* Res Judicata, and Collateral Estoppel

The Service argues that, as a result of the Connecticut Supreme Court's judgment in its favor on Santini's state-law takings claim, the *Rooker–Feldman* doctrine deprives the District Court and this Court of subject matter jurisdiction over Santini's Fifth Amendment takings claim and, in the event that *Rooker–Feldman* does not apply, res judicata and collateral estoppel bar Santini from litigating his takings claim in the federal courts. Santini counters that, even if *Rooker–Feldman,* res judicata, and collateral estoppel would otherwise apply, the unique procedural posture of post-*Williamson County* takings claims requires us to carve out exceptions to the preclusion doctrines. Before deciding whether to create the exceptions that Santini requests, however, we must determine whether any of the three preclusion doctrines applies.

■ The essence of the *Rooker–Feldman* doctrine "is that inferior federal courts have no subject matter jurisdiction over cases that effectively seek review of judgments of state courts and that federal review, if any, can occur only by way of a certiorari petition to the Supreme Court." *Moccio v. N.Y. State Office of Court Admin.,* 95 F.3d 195, 197 (2d Cir.1996). *Rooker–Feldman* bars those claims that were adjudicated in a prior state court action, as well as those claims that are "inextricably intertwined" with the state court judgment. *Id.* at 198–99. We have held that " 'inextricably intertwined' means, at a minimum, that where a federal plaintiff had an opportunity to litigate a claim in a state proceeding . . ., subsequent litigation of the claim will be barred under the *Rooker–Feldman* doctrine if it

would be barred under the principles of preclusion." *Id.* at 199–200.

■ Santini's Fifth Amendment takings claim was not litigated in the Connecticut state courts, where Santini asserted only a state-law takings claim. In order for *Rooker–Feldman* and res judicata to apply, then, Santini must have had the opportunity to litigate his federal takings claim in the state court action. Both federal and Connecticut law make clear that Santini did not have this opportunity. First, according to Santini, the only reason he brought a state-law takings claim before pursuing a federal claim is because he believed that *Williamson County* required him to do so. The Supreme Court held in *Williamson County* that, "because the Fifth Amendment proscribes takings *without just compensation,*" a takings claim is not ripe until the property owner has sought compensation through the procedures that the state provides. *Williamson County,* 473 U.S. at 194 n. 13, 105 S.Ct. 3108. The Court indicated that, if state law permits a property owner to bring an inverse condemnation action to obtain just compensation for an alleged taking, then the property owner must pursue such an action before bringing a Fifth Amendment takings claim under § 1983. *Id.* at 196–97, 105 S.Ct. 3108.

Applying *Williamson County,* we held in *Southview Associates,* 980 F.2d at 99–100, that the plaintiff's regulatory takings claim was not ripe because the plaintiff had not pursued an inverse condemnation action under Vermont law in state court. Like the plaintiffs in *Williamson County* and *Southview Associates,* Santini could not have brought a Fifth Amendment takings claim in federal court until *after* he brought a state law inverse condemnation action in state court. Moreover, under Connecticut law Santini could not have litigated his Fifth Amendment takings

claim in the state court action. In *Melillo v. City of New Haven,* 249 Conn. 138, 154 n. 28, 732 A.2d 133 (1999), the Connecticut Supreme Court held that the plaintiffs were not entitled to consideration of their federal takings claim in state court "because of the existence of a legally sufficient procedure, under article first, § 11, of the constitution of Connecticut, to obtain just compensation for the alleged taking of their property." Thus, because Santini neither brought, nor could have brought, a Fifth Amendment takings claim in the Connecticut state court action, *Rooker–Feldman* and res judicata do not apply. *See Moccio,* 95 F.3d at 199–200; *Isaac v. Truck Serv., Inc.,* 253 Conn. 416, 420–21, 752 A.2d 509 (2000).

■ Whether to apply collateral estoppel is a more difficult question. Collateral estoppel differs from *Rooker–Feldman* and res judicata in at least one significant respect. Collateral estoppel may preclude the relitigation of an issue that was actually litigated in a previous action, even if the claim in which the issue arises in the subsequent action was not brought and could not have been brought in the previous action whose judgment gives rise to the estoppel. *See, e.g., Gladysz v. Planning & Zoning Comm'n of Town of Plainville,* 256 Conn. 249, 260, 773 A.2d 300 (2001); *see also* Restatement (Second) of Judgments § 27 (1982) ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, *whether on the same or a different claim.*" (emphasis added)).

Ordinarily, collateral estoppel would apply if (1) an issue that is an essential element of Santini's Fifth Amendment takings claim was actually litigated in the state court action; and (2) the Connecticut

Supreme Court "made a determination that was necessary to its judgment with respect to that issue." *R & R Pool & Patio, Inc. v. Zoning Bd. of Appeals of Town of Ridgefield,* 257 Conn. 456, 467, 778 A.2d 61 (2001). The Connecticut Supreme Court rejected Santini's state-law takings claim because it concluded that the June 10 siting announcement constituted mere governmental planning, not an actionable taking. It is undisputed that this issue was actually litigated in the state courts and was necessary to the Supreme Court's decision. In addition, for the reasons discussed in Section IV, *infra,* the mere-governmental-planning issue is essential to Santini's Fifth Amendment takings claim as well. Nevertheless, we decline to apply collateral estoppel here for an independent reason.

■ The requirement of *Williamson County* that a property owner must pursue compensation through available state procedures, such as a state-law inverse condemnation action, before bringing a Fifth Amendment takings claim has created a Catch–22 for takings plaintiffs. Under *Williamson County,* a plaintiff may not bring a Fifth Amendment takings claim without first having unsuccessfully pursued a state-law takings claim. Under traditional notions of collateral estoppel, however, the state court's adverse judgment will often preclude the plaintiff's subsequent Fifth Amendment takings claim. *See, e.g., Dodd v. Hood River County,* 59 F.3d 852, 863 (9th Cir.1995) (stating that collateral estoppel bars federal takings claim if state court's earlier decision on state-law takings claim was "an equivalent determination under the federal taking clause"). Though application of the preclusion doctrines deprives a large class of plaintiffs of the opportunity to pursue Fifth Amendment takings claims in federal court—or, in many cases,

anywhere—most of the circuits to have addressed this issue have declined to create an exception to render res judicata and collateral estoppel inapplicable in this situation. *See, e.g. Wilkinson v. Pitkin County Bd. of County Comm'rs,* 142 F.3d 1319, 1324 (10th Cir.1998) ("We conclude the *Williamson* ripeness requirement is insufficient to preclude application of res judicata and collateral estoppel principles in this case."); *Palomar Mobilehome Park Ass'n v. City of San Marcos,* 989 F.2d 362, 364–65 (9th Cir.1993) (holding that res judicata bars federal takings claim); *Peduto v. City of N. Wildwood,* 878 F.2d 725, 729 (3d Cir.1989) (same); *see also Barefoot v. City of Wilmington,* 306 F.3d 113, 121 (4th Cir.2002) (holding that *Rooker–Feldman* doctrine deprived district court of jurisdiction over federal takings claim); *but see Anderson v. Charter Township of Ypsilanti,* 266 F.3d 487, 497 (6th Cir.2001) (holding that *Rooker–Feldman* doctrine bars federal takings claim brought by plaintiff who had initially brought both state and federal takings claims in state court and, after removal and remand, failed to reserve federal claim in state court); *Fields v. Sarasota Manatee Airport Auth.,* 953 F.2d 1299, 1305–06 (11th Cir.1992) (recognizing a limited exception to the applicability of res judicata and collateral estoppel to federal takings claims).

Although we are not prepared to declare res judicata and collateral estoppel wholly inapplicable to takings claims, we part ways with most of our sister circuits in favor of a middle ground. In *England v. Louisiana State Board of Medical Examiners,* 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964), the Supreme Court recognized a procedure whereby parties who are involuntarily litigating state-law claims in state court may "reserve" their federal claims for a later determination by a federal court. The plaintiffs in *England* filed a complaint in federal court raising claims under both federal and state law, and the district court abstained pursuant to *Railroad Commission v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), in order to permit the Louisiana state courts to resolve issues of state law. *England,* 375 U.S. at 412–13, 84 S.Ct. 461; *Temple of Lost Sheep Inc. v. Abrams,* 930 F.2d 178, 182 (2d Cir.1991). The plaintiffs then brought an action in state court, raising the federal and state claims. *England,* 375 U.S. at 413, 84 S.Ct. 461. After losing in state court, plaintiffs returned to federal court, where they sought to pursue their federal claims anew. *Id.* at 413–14, 84 S.Ct. 461. The district court dismissed the claims as precluded by the state court judgment, and the plaintiffs appealed directly to the Supreme Court. *Id.* at 414–15, 84 S.Ct. 461.

Concerned that litigants would otherwise be deprived of the opportunity to litigate their federal claims in federal court, the *England* Court created a mechanism whereby state-court litigants could reserve their federal claims and deprive the state court's judgment of preclusive effect in federal court. The Court stated, "There are fundamental objections to any conclusion that a litigant who has properly invoked the jurisdiction of a Federal District Court to consider federal constitutional claims can be compelled, without his consent and through no fault of his own, to accept instead a state court's determination of those claims." *Id.* at 415, 84 S.Ct. 461. The Court held that "if a party freely and without reservation submits his federal claims for decision by the state courts, litigates them there, and has them decided there, then . . . he has elected to forgo his right to return to the District Court." *Id.* at 419, 84 S.Ct. 461. The Court also held that "a party may readily forestall any conclusion that he has elected not to return to the District Court" by "inform[ing]

the state courts that he is exposing his federal claims there only for [a limited] purpose ..., and that he intends, should the state courts hold against him on the question of state law, to return to the District Court for disposition of his federal contentions." *Id.* at 421, 84 S.Ct. 461. Although the plaintiffs in *England* had not reserved their federal claims in state court, the Supreme Court declined to apply the case's holding to them, as they had incorrectly, but reasonably, believed that an earlier Supreme Court decision required them to raise their federal claims in state court. *Id.* at 422–23, 84 S.Ct. 461.

Admittedly, the procedural posture of this case differs somewhat from that of *England*, as Santini filed a complaint in state court first and, therefore, there was no occasion for a federal court to abstain. This distinction, however, is not a meaningful one. Although Santini initiated his action in state court, he was not in state court voluntarily. *See Fields*, 953 F.2d at 1306 (holding that "would-be federal court litigants who are forced to pursue state court proceedings in order to satisfy exhaustion requirements imposed by federal law incident to a takings clause claim are 'involuntarily' in the state courts, and therefore qualify for the exception to generally applicable res judicata principles").

Moreover, Santini did not, and could not, present his federal claim to the state court. The Supreme Court has made clear that these facts carry substantial weight in determining whether a § 1983 claim is barred by res judicata or collateral estoppel on the basis of a prior state court judgment. In *Migra v. Warren City School District Board of Education*, 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984), the Court held that state-court judgments have the same preclusive effect in federal-court § 1983 actions as they would have in state court. The Court noted, however, that the "petitioner d[id] not claim that the state court would not have adjudicated her federal claims had she presented them in her original suit in state court. Alternatively, petitioner could have obtained a federal forum for her federal claim by litigating it first in a federal court." *Id.* at 84–85, 104 S.Ct. 892. Here, in contrast, the Connecticut state courts would not have adjudicated Santini's federal takings claim if he had presented it to them, *see Melillo*, 249 Conn. at 154 n. 28, 732 A.2d 133, and Santini could not have litigated his federal takings claim in federal court before proceeding to state court, as it would have been dismissed as unripe, *see Southview Assocs.*, 980 F.2d at 100.[6]

**6.** In support of Santini, the *amici* urge us to hold that the second prong of *Williamson County* requires only that plaintiffs pursue just compensation through state administrative proceedings, not through state-court inverse condemnation actions. For two independent reasons, however, this argument does not avail Santini. First, we are bound by *Williamson County* and *Southview Associates*, both of which require takings plaintiffs to pursue state-law inverse condemnation actions before bringing federal takings claims. We decline *amici*'s invitation to find that the Supreme Court overruled *Williamson County sub silentio* in *City of Chicago v. International College of Surgeons*, 522 U.S. 156, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997). If the Supreme Court had intended to overrule the ripeness

requirement of *Williamson County*, it would have said so explicitly. *See Hohn v. United States*, 524 U.S. 236, 252–53, 118 S.Ct. 1969, 141 L.Ed.2d 242 (1998) ("This is not to say opinions passing on jurisdictional issues *sub silentio* may be said to have overruled an opinion addressing the issue directly. Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." (internal citation omitted)). Second, precedent aside, because Santini has already brought an inverse condemnation action in state court, our holding that such an action is not required would not benefit him. To the contrary, if Santini's state-court litigation were not required, then

While we have not previously held that parties may use the *England* reservation procedure in cases that did not properly originate in federal court, we deem it appropriate to permit parties like Santini, who litigate state-law takings claims in state court involuntarily, to reserve their federal takings claims for determination by a federal court. It would be both ironic and unfair if the very procedure that the Supreme Court required Santini to follow before bringing a Fifth Amendment takings claim—a state-court inverse condemnation action—also precluded Santini from ever bringing a Fifth Amendment takings claim. We do not believe that the Supreme Court intended in *Williamson County* to deprive all property owners in states whose takings jurisprudence generally follows federal law (*i.e.*, those to whom collateral estoppel would apply) of the opportunity to bring Fifth Amendment takings claims in federal court. Thus, in permitting state-court litigants to reserve their federal takings claims for determination in subsequent federal-court actions, we decline to interpret *Williamson County* in such a way as to deprive a large class of prospective plaintiffs of federal forums for their federal takings claims.[7]

▪ Future takings plaintiffs will still have to comply with the *Williamson County* requirement that they pursue available inverse condemnation actions under state law before bringing federal takings claims. In doing so, however, such parties may explicitly reserve their federal takings claims, making clear to the state court and adverse parties that they intend

to bring a federal takings claim in federal court once the litigation of the state-law claim has been completed. This "*Santini* reservation" will mean that the state court's judgment on the state-law claim would not have preclusive effect in the subsequent federal action. Although Santini did not make such a reservation in Connecticut state court, we apply the reservation requirement prospectively only, and we deem Santini, who neither litigated his federal claim in state court nor sought to do so, to have reserved his federal claim. *See England,* 375 U.S. at 422–23, 84 S.Ct. 461 (applying new rule prospectively); *Bd. of Regents of Univ. of State of N.Y. v. Tomanio,* 446 U.S. 478, 498, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980) (Brennan, J., dissenting) (advocating "wholly prospective" application of reservation rule). Thus, because the judgment of the Connecticut Supreme Court on Santini's state-law claim has no preclusive effect here, we turn to the merits of the takings claim.

### III. Summary Judgment

▪ The fact that Santini's takings claim is based on nothing more than the Service's 1991 siting announcement—perhaps the prototypical precondemnation governmental activity—dooms the claim on its merits, as the Supreme Court has explicitly held that precondemnation activities do not constitute takings. The Court has stated:

> Appellants also claim that the city's precondemnation activities constitute a tak-

---

his presence in state court would have been voluntary, and his federal claim would be barred by collateral estoppel.

**7.** We recognize that, unlike Connecticut, other states may permit property owners to bring state and federal takings claims simultaneously. Plaintiffs who pursue inverse condemnation actions in those states in order to comply

with *Williamson County* also may reserve their federal claims for subsequent federal court adjudication. This result is consistent with *England,* in which the plaintiffs were permitted to raise their federal claims anew in federal court even though they had already litigated them in state court.

ing. The State Supreme Court correctly rejected the contention that the municipality's good-faith planning activities, which did not result in successful prosecution of an eminent domain claim, so burdened the appellants' enjoyment of their property as to constitute a taking. Even if the appellants' ability to sell their property was limited during the pendency of the condemnation proceeding, the appellants were free to sell or develop their property when the proceedings ended. Mere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are incidents of ownership. They cannot be considered as a taking in the constitutional sense.

*Agins v. City of Tiburon,* 447 U.S. 255, 263 n. 9, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980) (citations and internal quotation marks omitted); *see also Danforth v. United States,* 308 U.S. 271, 285, 60 S.Ct. 231, 84 L.Ed. 240 (1939) (stating that "[a] reduction or increase in the value of property ... by reason of legislation for or the beginning or completion of a project" does not constitute a taking). The Supreme Court later cited *Agins* and *Danforth* with approval for the proposition that "depreciation in value of [ ] property by reason of preliminary activity is not chargeable to the government." *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 320, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987).

There is no doubt that the siting announcement constitutes "preliminary activity" as that term is used in *First English,* as the announcement was but one step of many that the state had to pursue before it could condemn Santini's property. The Service never conducted the requisite onsite examination of Santini's property, never selected it as the preferred site, did not monitor it for twelve months as required by NRC regulations, and did not obtain the necessary permits from the NRC, the Connecticut Department of Environmental Protection, and the Connecticut siting council.

Despite *Agins, Danforth,* and *First English,* Santini argues that the siting announcement constitutes a taking under *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) or, alternatively, under *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). As Santini acknowledges, *Lucas* requires him to show that the siting announcement deprived him of all economically viable use of his property. *Lucas,* 505 U.S. at 1030, 112 S.Ct. 2886. Santini cannot make this showing. Following the trial in Santini's state-court action, the Superior Court noted that "[n]one of the experts said plaintiffs' land had no economic or productive use except one expert said that the Ellridge [property] had no agricultural value and the Pinney Street land had lost one-half its value as agricultural land." *Santini v. Conn. Hazardous Waste Mgmt. Serv.,* No. CV 94 0538646S, 1998 WL 422166, at *5 (Conn.Super. July 13, 1998). Accordingly, the Superior Court found, and we agree, that "both [of Santini's properties] did have use and value after the notice." *Id.* The temporary nature of the siting announcement is significant. As the Supreme Court has stated, "Logically, a fee simple estate cannot be rendered valueless by a temporary prohibition on economic use, because the property will recover value as soon as the prohibition is lifted." *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 332, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002). Indeed, Santini acknowledges that his property recovered at least some of its value after the siting announcement was withdrawn.

Nor can Santini succeed under *Penn Central.* First, to the extent there is any tension between *Penn Central* and *Agins,* we note that *Agins,* which was decided two years after *Penn Central,* held that pre-condemnation activity that restricts a land-owner's ability to sell or develop property or causes a diminution in its value does not constitute a taking. *Agins,* 447 U.S. at 263 n. 9, 100 S.Ct. 2138. Regardless, *Agins* is easily reconciled with *Penn Central.* The factors of "particular significance" to the *Penn Central* analysis are "[t]he economic impact of the regulation on the claimant," "the extent to which the regulation has interfered with distinct investment-backed expectations," and "the character of the governmental action." *Penn Central,* 438 U.S. at 124, 98 S.Ct. 2646. Though the siting announcement no doubt had an economic impact on Santini's property, and interfered with his investment-backed expectations to some extent, the character of the governmental action is of principal importance here. The Service's siting announcement obviously cannot be characterized as a "physical invasion" of Santini's property, *id.,* but, rather, merely one step along a path that might have led—but ultimately did not lead—to the government's acquisition of his property. The relatively swift overruling of the siting announcement is also significant, as the Supreme Court has held that "the duration of the restriction is one of the important factors that a court must consider in the appraisal of a regulatory takings claim." *Tahoe–Sierra,* 535 U.S. at 342, 122 S.Ct. 1465.

We are not unmindful of the economic impact that the siting announcement obviously had on Santini's efforts to develop and sell his property. Unfortunately for Santini, however, this impact does not necessarily mean that the governmental action of which he complains constitutes a taking. The Court recognized in *Penn*

*Central* that "in a wide variety of contexts, . . . government may execute laws or programs that adversely affect recognized economic values." *Penn Central,* 438 U.S. at 124, 98 S.Ct. 2646. Such programs are, as noted above, mere incidents of property ownership. *See Park Ave. Tower Assocs. v. City of New York,* 746 F.2d 135, 139 (2d Cir.1984) (citing "legion of cases that have upheld regulations which severely diminished the value of commercial property"); *see also First English,* 482 U.S. at 320, 107 S.Ct. 2378; *Agins,* 447 U.S. at 263 n. 9, 100 S.Ct. 2138; *Danforth,* 308 U.S. at 285, 60 S.Ct. 231. Santini cannot "satisfy the heavy burden placed upon one alleging a regulatory taking." *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 493, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). Therefore, whatever the economic impact of the siting announcement upon Santini's property, no compensable taking occurred.

Our decision also makes for sound public policy. As the Connecticut Supreme Court noted, "if the government were to be considered as having accomplished a compensable taking as a result of mere planning that, because of its publicity, harmed the value of property, public planning would be discouraged, and governmental secrecy in the planning process would be encouraged." *Santini v. Conn. Hazardous Waste Mgmt. Serv.,* 251 Conn. 121, 142, 739 A.2d 680 (1999). Similarly, in declining to adopt a categorical rule that temporary regulations depriving property owners of all economically viable use of their property constitute takings, the Supreme Court observed, "A rule that required compensation for every delay in the use of property would render routine government processes prohibitively expensive or encourage hasty decisionmaking." *Tahoe–Sierra,* 535 U.S. at 335, 122 S.Ct. 1465; *see also id.* at 337, 122 S.Ct. 1465 (rejecting narrower *per se* rule because "it

would still impose serious financial constraints on the planning process"). We do not believe that the Takings Clause requires a state to choose among planning in secret, not planning at all, and exposing itself to takings claims from every property owner whose land might be affected by its plans. Accordingly, the Service is entitled to judgment on the merits of Santini's Fifth Amendment takings claim.

## CONCLUSION

For these reasons, we affirm the judgment of the District Court.